UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHARITY HALASZ and THOMAS HALASZ,
On behalf of their child, H.H., a minor;

        Plaintiffs,                         Case No. 1:22-cv-13158

v.                                          Honorable Thomas L. Ludington
                                           United States District Judge

CASS CITY PUBLIC SCHOOLS, et al.,

        Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT, DISMISSING PLAINTIFF'S AMENDED COMPLAINT, AND DENYING PLAINTIFF'S MOTIONS *IN LIMINE* AS MOOT**

On November 30, 2021, a 15-year-old student opened fire at Oxford High School in what would become the deadliest high school shooting in Michigan history. Four students were killed. Seven others were severely injured. This case begins less than one week later, at a Michigan public school located less than 90 minutes away.

On December 6, 2021, Cass City Public School (CCPS) dedicated part of the morning to discussing the Oxford tragedy with its students. Following this discussion, Plaintiff H.H.—an eighth-grade student at CCPS—made a remark about a gun to several other students. The precise remark is disputed. But it is undisputed that at least four students perceived the remark as a threat and reported it to their parents and the CCPS Administration.

CCPS promptly launched an investigation. The Michigan State Police (MSP) did, too. That afternoon, MSP Lieutenant Brian McComb, CCPS Behavioral Officer Donald Markel, and Superintendent Allison Zimba interviewed Plaintiff in the CCPS main office and searched his person, backpack, and locker. Finding no firearm, Plaintiff was sent home. Zimba, Markel, and

Lieutenant McComb interviewed Plaintiff's classmates throughout the afternoon. Based on these interviews, the CCPS Administration—Zimba, Markel, and Principal William Hartzell—found it more likely than not that Plaintiff made a threatening remark about a gun. As outlined in CCPS Policy, Plaintiff was assessed eight disciplinary points for this threat. If Plaintiff had no disciplinary history or if the CCPS Administration assessed even one less disciplinary point, the case would have ended here.

But, throughout his eighth-grade year, Plaintiff had already accumulated seven disciplinary points for other types of misconduct, ranging from tardiness to touching his classmate's breasts. When a student reaches 15 disciplinary points, the Administration has three options under CCPS Policy: (1) refer the student to the CCPS Board of Education for an expulsion hearing, (2) suspend the student for 10 days, or (3) implement a "one point rule" such that the student has one more chance before suspension or expulsion. Here, based on the severity of Plaintiff's threat and his prior misconduct, the CCPS Administration referred him to the Board for an expulsion hearing.

Plaintiff received notice of this hearing. Plaintiff attended this hearing with his parents and was represented by counsel. At the hearing, Plaintiff had the opportunity to call witnesses and present evidence challenging the Administration's conclusion that he made a threatening remark about a gun as well as the propriety of expulsion, as opposed to lesser punishments. But, after the Board considered the "Mandatory 7 Factors" outlined in CCPS Policy, it expelled him.

After receiving leave, Plaintiff—through his parents—filed an Amended Complaint in September 2025 against Defendants CCPS, Zimba, Markel, Hartzell, and Board Member Stacey Bliss. Plaintiff pursues two constitutional claims. First, Plaintiff alleges Defendants searched his person and seized him in violation of the Fourth Amendment. Second, Plaintiff alleges Defendants expelled him without due process in violation of the Fourteenth Amendment. Plaintiff also pursues

various state tort claims. Currently before the Court is Defendants' joint Renewed Motion for Summary Judgment. As explained below, all Defendants are entitled to summary judgment on all claims. So Defendants' Motion will be granted, Plaintiff's Amended Complaint will be dismissed, and Plaintiff's pending evidentiary motions *in limine* will be denied as moot.

## I.

### A.  December 6, 2021 Threat and Investigation

On December 6, 2021, Plaintiff H.H. was an eighth-grade student at Cass City Public Schools (CCPS). ECF No. 17-2 at PageID.198. That morning, during first period, the CCPS Administration (the "Administration") showed all students an informational video about the Oxford school shooting to address growing concerns about student safety in the aftermath of the close-to-home tragedy. *Id.* at PageID.198–99; ECF Nos. 17-8 at PageID.571–72; 17-7 at PageID.453 (discussing how, after Oxford, schools across Michigan were the target of similar, "copycat[]" threats). After the video, the Administration answered student questions about school safety. ECF No. 17-9 at PageID.620.

Two hours later, during Plaintiff's third-period science class, he called his mother and asked to be picked up from school because he was nauseous. *Id.* at PageID.623. Plaintiff's mother called Plaintiff's grandmother and asked if she could pick Plaintiff up from school. ECF No. 17-2 at PageID.201. Plaintiff's grandmother agreed, and Plaintiff's mother notified the Administration. *Id.* Plaintiff then went to CCPS's main office and waited for his grandmother to arrive. ECF No. 17-9 at PageID.624.

But the Michigan State Police (MSP) arrived first. Unbeknownst to Plaintiff at the time, several CCPS students reported that, during third period, Plaintiff said something about having a

gun in his bag or bringing a gun to school. *See* ECF Nos. 17-10 at PageID.655, 658, 660, 663; 18-1 at PageID.712, 720, 724.

Plaintiff's precise comment is disputed. Plaintiff maintains he was discussing the Oxford shooting with another student at a lab table and said, "I can't believe [the shooter] made it out of the office with a gun in his bag." ECF No. 1 at PageID.4. But one student, D.H., maintains Plaintiff "said that he had guns and that if he brought them to the school, nobody would do anything about it[.]" ECF No. 17-10 at PageID.654. Another student, H.B., maintains Plaintiff said "something about[] bringing a fake but metal gun into school." ECF No. 17-11 at PageID.680. Yet another student, R.E., maintains that Plaintiff said "something about having a gun in his bag[.]" ECF No. 18-2 at PageID.745. A fourth student, R.B., maintains Plaintiff said he "was thinking about bringing a gun to school." ECF No. 18-1 at PageID.711. And R.B. recalls this comment was particularly frightening because, before December 6, 2021, Plaintiff told R.B. and other classmates that he "hunts," "has access to guns," and "could just go get one" if he wanted to. *Id.* at PageID.729.

Regardless of the specific wording Plaintiff used, R.B. texted her mother—CCPS Board Member Stacey Bliss—that Plaintiff's remark made her feel unsafe. ECF No. 18-3 at PageID.761. Both R.B. and D.H. reported Plaintiff's remark to CCPS teachers. ECF Nos. 18-1 at PageID.712.; 17-10 at PageID.661. After receiving the text from her daughter R.B., Bliss called CCPS Superintendent Allison Zimba and asked that she investigate. ECF No. 18-4 at PageID.860. Zimba then approached CCPS Principal William Hartzell, who had just received a phone call from another parent reporting Plaintiff's remark. ECF No. 17-8 at PageID.484. The two reported the incident to CCPS Behavioral Officer Donald Markel, who in turn alerted MSP Lieutenant Brian McComb, who was already stationed in the CCPS parking lot in response to another, unrelated incident. ECF No. 17-7 at PageID.421–22.

At around 11:45 AM, Lieutenant McComb, Behavioral Officer Markel, and Superintendent Zimba searched and interviewed Plaintiff, who was already in the CCPS office waiting for his grandmother to pick him up. *Id.* at PageID.423; ECF No. 18-7 at PageID.956. All Parties agree that, before being questioned, Plaintiff was not advised of his *Miranda* rights, nor informed that he was being criminally investigated. ECF Nos. 18-7 at PageID.957. Plaintiff denied making any threats about having a gun or bringing a gun to school. ECF No. 18-7 at PageID.956. After no more than ten minutes of questioning, ECF Nos. 17-4 at PageID.256; 17-7 at PageID.433, Plaintiff complied with requests to remove his sweatshirt and shoes.[1] ECF Nos. 17-7 at PageID.427; 18-4 at PageID.819, 822, 859–60. Superintendent Zimba searched Plaintiff's backpack, ECF No. 18-4 at PageID.819, and Behavioral Officer Markel searched Plaintiff's locker, ECF No. 17-4 at PageID.313. No firearm was found. ECF No. 18-7 at PageID.957. Plaintiff then left CCPS with his grandmother, who arrived at the school while Plaintiff was being questioned. ECF Nos. 18-4 at PageID.820, 823.

The school and MSP continued their separate but simultaneous investigations throughout the afternoon and evening on December 6, 2021. In the afternoon, after Plaintiff left school, Lieutenant McComb, Superintendent Zimba, and Behavioral Officer Markel interviewed several students who overheard Plaintiff's remark, including those who reported the remark to their teachers and parents. *See* ECF Nos. 17-7 at PageID.428; 18-7 at PageID.957–62; 18-5 at

---

[1] Plaintiff alleges that he was "asked to . . . pull his shirt up exposing his full torso and outstretch the elastic on both the waist and legs of his sweatpants." ECF No. 1 at PageID.5; *see also* ECF No. 17-9 at PageID.625. But Superintendent Zimba expressly denies this allegation, ECF No. 18-4 at PageID.820, and the other two individuals present during the December 6, 2021 search—Lieutenant McComb and Behavioral Officer Markel—do not recall asking Plaintiff to lift his shirt or outstretch his waistband. *See* ECF Nos. 17-4 at PageID.289–90; 17-7 at PageID.427. Moreover, McComb's police report does not reflect that Plaintiff was ever asked to lift his shirt or move his waistband. ECF No. 18-7 at PageID.957.

PageID.89. Later that evening, MSP Detective Brian Cairnduff and two MSP Troopers searched Plaintiff's house. ECF No. 17-7 at PageID.434, 436.

Although troopers observed a gun safe in Plaintiff's house—where Plaintiff notably admits he stores *his* hunting rifle, ECF No. 17-9 at PageID.625—MSP concluded "no weapon [was] located" throughout the search of Plaintiff's house. ECF No. 18-6 at PageID.930. Based on this finding, MPS ultimately concluded that Plaintiff "may have been misunderstood," had no access to guns, and did not pose any immediate danger to CCPS. ECF No. 18-4 at PageID.829. Importantly, MSP shared this conclusion with Superintendent Zimba later in the evening. *See id.*; ECF No. 17-7 at PageID.435. However, Zimba's contemporaneous investigative notes reflect that, although MSP "did not find enough information to *prosecute* [Plaintiff]," Lieutenant McComb told Zimba that MSP "did not feel comfortable with [Plaintiff] *remaining in school*." ECF No. 18-5 at PageID.895 (emphasis added); *see also* ECF No. 18-4 at PageID.814 ("Just because [MSP] didn't think that [Plaintiff] had access to weapons at home does not necessarily mean that he isn't a concern at our school."). And, although MSP concluded Plaintiff did not violate the *law*, the CCPS Administration—Superintendent Zimba, Principal Hartzell, and Behavioral Officer Markel—concluded Plaintiff violated the *CCPS code of conduct* by making a threatening remark about a gun. ECF No. 18-7 at PageID.957; *see also* ECF No. 17-2 at PageID.213.

### B. Cass City Public Schools Disciplinary Procedure

Before turning to how Plaintiff was disciplined for this remark, it is important to understand CCPS's Student Discipline Code. It's complicated. The discipline of all CCPS students is governed by a "Point System," in which student misconduct has corresponding point values, which increase based on severity. The CCPS Student Handbook provides the following examples:

| Type of Misconduct | Points |
|---|---|
| Fake telephone call/note | 1 |
| Excessive display of affection | 1 |
| Improper dress/language | 1 |
| Violation of school/classroom rules | 1 |
| Leaving school/class without permission | 2 |
| Misuse of permits | 2 |
| Refusal to identify oneself to school personnel | 3 |
| Insubordination | 3 |
| Lack of cooperation with school personnel | 3 |
| Disruptive conduct | 3 |
| Persistent misbehavior | 3 |
| Bullying | 3-6 |
| Gross misbehavior | 6 |
| Trespassing (illegal entry) | 3 |
| Burglary | 6 |
| Use, possession, or distribution of tobacco | 6 |
| Extortion, blackmail, or coercion | 6 |
| Larceny | 6 |
| Fighting or provoking a fight | 6-9 |
| Possession of firecracker or incendiary device | 6 |
| Malicious mischief (property damage under $100) | 6 |
| Malicious mischief (property damage over $100) | 9 |
| Use, possession, or distribution of alcohol | 12 |
| False alarm | 12 |
| Illegal use of explosives | 12 |
| Bomb threat | 15 |
| Assault | 15 |
| Unauthorized sale, possession, or use of illegal or dangerous weapons | 15 |
| Arson | 15 |

ECF No. 17-5 at PageID.380–81. However, the Handbook provides that these examples "are not

the only acts or conditions which will lead to disciplinary action nor do they limit this policy in

any way." *Id.* at PageID.381. Although "[a]ll points [are] assessed by the [CCPS] principal or

assistant principal," *id.* at PageID.381 (emphasis omitted), neither the Handbook nor the CCPS

Student Discipline Code explain *how clear* evidence of misconduct must be to justify disciplinary

points in the first instance, nor how the CCPS principal or assistant principal should determine

*how many* points to assess against a student who commits an infraction unidentified on the list

above. Moreover, neither the Handbook nor the CCPS Student Discipline Code explain what rights, if any, students may have to contest individual point assessments.

With some exceptions, disciplinary points accumulate throughout the school year but reset each year. *See id.* And students "who do not accumulate points during any 30 school day[] period will have their point total reduced by three[] until it reaches zero[.]" *Id.* Importantly, a student is *not* disciplined each time he or she receives disciplinary points. But if a student's point total reaches certain thresholds, the Administration must initiate certain forms of discipline.

A student with six points will be suspended for one day. *Id.* A student with nine points will be suspended for three days. *Id.* A student with 12 points will be suspended for five days. *Id.* And, at 15 points, the Administration has three options:

(1) The Administration may initiate the "one point rule," such that a student will be subject to lengthy suspension or expulsion if they acquire just "one more point";
(2) The Administration may refer the student to the CCPS School Board (the "Board") for an expulsion hearing; or
(3) The Administration may suspend the student for 10 days, and require a meeting with the student's parents before the student is "allowed back in school."

*Id.* Notably, the CCPS Handbook emphasizes that an expulsion hearing referral is particularly appropriate "in case[s involving] weapons and gross misbehavior violations." *Id.*

When the Administration decides to refer a student to the Board for an expulsion hearing, the CCPS Policy requires the Superintendent to provide the student's parents or guardians with written notice of the hearing, along with (1) "the offense the student is suspected to have committed," and (2) "an explanation of the evidence" the Administration considered when concluding the student violated school rules and, separately, when recommending the specific consequence of expulsion. ECF No. 19-1 at PageID.1139. Moreover, this written notice must explain the student's rights at the expulsion hearing, which include the right to counsel and the

right to present evidence and witnesses to contest both the Administration's factual finding of misconduct and the expulsion recommendation. *Id.*

An important, separate policy governs the Board's expulsion hearings. After the Board concludes that a student violated CCPS rules, the Board considers what it refers to as "the Mandatory 7 Factors" to decide whether the student should be expelled:

(1) The student's age and ability to know the difference between right and wrong;
(2) The Student's disciplinary history;
(3) Whether the student has a disability;
(4) The seriousness of the student's behavior or misconduct;
(5) Whether the student's behavior or misconduct posed a safety risk;
(6) Whether restorative practices "are a better option"; and
(7) Whether any lesser intervention would more appropriately address the student's behavior or misconduct.

ECF Nos. 19-1 at PageID.1130–31; 17-8 at PageID.558

### C. Plaintiff's Discipline

Before the Administration concluded Plaintiff made a threatening remark about a gun during school on December 6, 2021, Plaintiff had accumulated seven disciplinary points throughout his eighth-grade school year. Plaintiff received three points for calling another student a "stupid bitch," grabbing her, and touching her "boob" after she told him to stop.[2] ECF No. 17-3 at PageID.236. He received another point for putting sticky notes on students and refusing to follow his teachers' instructions to put his phone away. *Id.* at PageID.235. The next day, Plaintiff received one more point for excessive tardiness. *Id.* In November 2021, Plaintiff received another point after admitting that he told another student to "close her legs" while making a "waving

---

[2] Both Plaintiff and his mother maintain he "never touched" the other CCPS student, and both disagree with CCPS's decision to issue disciplinary points because the other student kicked Plaintiff in the groin during the same incident. ECF Nos. 17-2 at PageID.209–10; 17-9 at PageID.616.

gesture." *Id.* Because this was Plaintiff's sixth point, he received an in-school suspension. *Id.* On December 2, 2021, Plaintiff received an additional point—his seventh—for excessive tardiness. *Id.* at PageID.234.

But Plaintiff's Discipline Report documents several other instances of misconduct for which Plaintiff did not receive any disciplinary points. For example, in September 2021, Plaintiff was listening to music during class and, when caught, refused to give his earbuds to his teacher, telling his teacher "these are expensive and I am not giving them to you," "you have no right to tell me what to do," and "we'll just see what my mom has to say about this." ECF No. 17-3 at PageID.236. And, in November 2021, Plaintiff used the elastic string on a facemask to "make a weapon" and, "like an arrow," "used this string to shoot a pencil at another student, lead facing the student." *Id.* at PageID.234.

On December 6, 2021, Behavioral Officer Markel assessed *eight points* against Plaintiff for his comment about a gun, classifying the comment as "gross misbehavior." *Id.* at PageID.230. It remains unclear (1) why Plaintiff's comment was classified as "gross misbehavior" and (2) why Plaintiff was assessed *eight points*, as opposed to any lesser amount, especially considering the CCPS Handbook suggests a *six-point* assessment for a student who engages in undefined "gross misbehavior." ECF No. 17-5 at PageID.380–81. This latter issue is critical because Plaintiff's eight-point assessment increased his point total to 15 and triggered the Administration's decision to either implement the "one point rule," suspend Plaintiff, or refer him to the Board for an expulsion hearing. ECF No. 17-5 at PageID.381. Had Plaintiff been assessed even one less point for his "gross misbehavior"—or had he not accumulated seven prior points—his case seemingly would not have been referred to the Board, and he seemingly would not have been expelled.

Yet, on December 7, 2021, the Administration—Zimba, Hartzell, and Markel—decided to refer Plaintiff's case to the Board with the recommendation that the Board expel him for 180 days. *See* ECF Nos. 18-8 at PageID.967; 17-4 at PageID.258. That same day, Superintendent Zimba sent Plaintiff and his parents a letter outlining the Administration's decision and Plaintiff's due process rights. ECF No. 18-8. The letter also notified Plaintiff and his parents that the expulsion hearing was scheduled for December 13, 2021, and that Plaintiff would be suspended in the meantime. *Id.*

At his December 13, 2021 expulsion hearing, Plaintiff was represented by counsel and appeared alongside his mother and father. ECF No. 17-2 at PageID.215–16. Board Member Stacey Bliss—the mother of R.B., who reported Plaintiff's remarks to Superintendent Zimba—was present but abstained from voting. ECF No. 18-6 at PageID.908. The hearing lasted "about 45 minutes to an hour." ECF No. 17-9 at PageID.640. During the hearing, Plaintiff and his attorney had the opportunity to present evidence that (1) Plaintiff did not make a threatening statement about a gun and (2) even if he did, an expulsion was unwarranted. *See* ECF No. 17-2 at PageID.215. But the Board ultimately concluded that, "[b]ased on a preponderance of evidence presented at the hearing," Plaintiff made a threatening remark about a gun in school, and after considering the "Mandatory 7 Factors," voted to expel Plaintiff for 180 days, as the Administration recommended. ECF No. 19-2 at PageID.1147.

Notably, as reflected in the December 14, 2021 letter sent to Plaintiff and his parents, Plaintiff may have been eligible for "reinstatement" after his expulsion. ECF No. 19-2 at PageID.1147–48 (referring to ECF No. 19-1 at PageID.1140); *see also* MICH. COMP. LAWS § 360.1311(6). But Plaintiff never sought reinstatement. ECF No. 17-2 at PageID.219. Moreover, Plaintiff's mother concedes that CCPS provided Plaintiff access to virtual instruction throughout

his expulsion but that Plaintiff never enrolled, choosing instead to withdraw from CCPS and enroll in a separate virtual program. *Id.* at PageID.218–20.

### D. Procedural Posture

On December 30, 2022, Plaintiff's parents filed a complaint on his behalf against Defendants (1) CCPS, (2) Principal William Hartzell, (3) Superintendent Allison Zimba, (4) Behavioral Officer Donald Markel, and (5) Board Member Stacey Bliss. ECF No. 1. In September 2024, this Court granted Plaintiff leave to file an amended complaint and a Fourteenth Amendment due process claim. *See Halasz ex rel. H.H. v. Cass City Pub. Sch.*, 748 F. Supp. 3d 482 (E.D. Mich. 2024).

Plaintiff filed his Amended Complaint on September 6, 2024. ECF No. 33. In Count I, Plaintiff alleges Defendants Markel, Zimba, and CCPS unreasonably searched and seized him on December 6, 2021, in violation of the Fourth Amendment and 42 U.S.C. § 1983. *Id.* at PageID.1455–57. In Count II, Plaintiff alleges that he was expelled without due process, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. ECF No. 33 at PageID.1457–60. It remains unclear whether Plaintiff alleges Defendants deprived him of procedural due process, substantive due process, or both. *See id.* In Count III, Plaintiff alleges all Defendants were negligent. *Id.* at PageID.1461–63. In Count IV, Plaintiff alleges all "Individual Defendants"— Hartzell, Zimba, Markel, and Bliss—intentionally inflicted emotional distress. *Id.* at PageID.1463– 64. And, in Count V, Plaintiff alleges all individual Defendants negligently inflicted emotional distress. *Id.* at PageID.1464–65.

Plaintiff's Amended Complaint is summarized below:

| Count | Claim | Defendant(s) |
|-------|-------|--------------|
| I | Fourth Amendment Unreasonable Search and Seizure; 42 U.S.C. § 1983 | Markel, Zimba, CCPS |
| II | Fourteenth Amendment Due Process; 42 U.S.C. § 1983 | All |
| III | Negligence | All |
| IV | Intentional Infliction of Emotional Distress | Individual Defendants |
| V | Negligent Infliction of Emotional Distress | Individual Defendants |

*See generally* ECF No. 33. Plaintiff seeks actual damages, punitive damages, and an "injunction requiring Defendants to clear Plaintiff[']s educational records of any wrongdoing related to the December 6, 2021[] incident[.]" *Id.* at PageID.1465.

On October 7, 2024, Defendants filed a joint Renewed Motion for Summary Judgment. ECF No. 36. Plaintiff responded two weeks later, ECF No. 38, and Defendants filed a reply in support on November 4, 2024. ECF No. 40.

## II.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The court must view the evidence and draw all reasonable inferences in favor of the nonmovant and determine "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

When the moving party "also bears the burden of persuasion at trial, [its] 'initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."' *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (quoting *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)); *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) ("[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.") (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984) (emphasis omitted))).

### III. Constitutional Claims

The analysis begins with Counts I and II, Plaintiff's federal constitutional claims. Under 42 U.S.C. § 1983, a plaintiff may sue any "person" who, under the color of state law, deprives them of any rights, privileges, or immunities secured by the Constitution or federal law. *See* 42 U.S.C. § 1983. To prevail under § 1983, a plaintiff must prove (1) the deprivation of a federal right (2) caused by a person acting under the color of state law. *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018); *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015); *see also Jones v. Muskegon Cnty.* 625 F.3d 935, 941 (6th Cir. 2015). But Plaintiff pursues his constitutional claims against both individual and municipal Defendants, and different legal frameworks apply to each.

When an individual defendant is sued, the doctrine of qualified immunity shields them from personal capacity liability if "their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Indeed, qualified immunity protects "all but the plainly incompetent and those who knowingly violate the law." *Id.*; *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

When analyzing qualified immunity, courts apply the "*Saucier* two-step," asking (1) whether a constitutional right has been violated; and (2) whether that right was clearly established—though reviewing courts need not proceed in this order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no longer be treated as mandatory."). The latter "clearly established" prong analyzes whether it was sufficiently clear that a reasonable officer would understand their actions violate the plaintiff's federally protected rights. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citing *Reichle v. Howards*, 566 U.S. 658 (2012)). While there need not be a case directly on point, existing precedent must place the constitutional question "beyond debate." *Id.* Sources of "clearly established law" include, from most to least persuasive, Supreme Court precedent, controlling Sixth Circuit precedent, this Court's precedent, or a "robust consensus of cases of persuasive authority." *See Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 876 (6th Cir. 2012); *Ashcroft*, 563 U.S. at 742. Importantly, when a defendant raises a qualified immunity defense, the plaintiff has the burden of demonstrating that the defendant is not entitled to it. *See Hart v. Hillsdale Cnty.*, 973 F.3d 627, 635 (6th Cir. 2020); *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

On the other hand, when a plaintiff sues a municipality under § 1983, qualified immunity does not apply, but the evidentiary requirements of "*Monell*" do. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). In *Monel v. Dep't of Soc. Servs. of City of New York*, the Supreme Court held that

municipalities—like CCPS here—can be treated as "persons" and subject to § 1983 liability. 436 U.S. 658, 690 (1978). But a municipality cannot be liable for § 1983 deprivations merely because it employs an officer who deprives someone of their constitutional rights. *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory."). And a municipality cannot be liable if its officers commit no constitutional violation in the first place. *Roell v. Hamilton Cnty.*, 870 F.3d 471, 487 (6th Cir. 2017). Instead, municipalities are only liable under *Monell* for their "official policies" which cause an employee to violate another's constitutional rights. *Monell*, 436 U.S. at 692.

Generally, there are four "avenues" a plaintiff may take to prove the existence of a municipal defendant's illegal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) single actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Id.*; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). But even when a plaintiff can show a sufficient official policy, a plaintiff must also "connect the policy to the municipality, and [] show that [the] particular injury was incurred due to the execution of that policy." *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 404 (6th Cir. 2010).

Each of Plaintiff's constitutional claims will be addressed in turn, beginning with whether Plaintiff has shown material questions of fact supporting an underlying constitutional violation. If so, the Court will then turn to whether the individual Defendants are entitled to qualified immunity, and whether Defendant CCPS is liable as a municipality under *Monell*.

## A.  Fourth Amendment Search and Seizure

In Count I, Plaintiff alleges individual Defendants Zimba and Markel,[3] and municipal Defendant CCPS, searched and seized him on December 6, 2021 in violation of his Fourth Amendment rights.[4] ECF No. 33 at PageID.1447–50. But the search and seizure were both reasonable, so Plaintiff's Fourth Amendment rights were not violated.

The Fourth Amendment protects "persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. This prohibition on unreasonable searches and seizures "applies to conduct by school officials." *Crochran through Shields v. Columbus City Sch.*, 748 F. App'x 682, 685 (6th Cir. 2018). When analyzing a Fourth Amendment claim, courts first ask whether a search or seizure occurred and, if so, whether this search or seizure was reasonable. *See Graves v. Mahoning Cnty.*, 821 F.3d 772, 775 (6th Cir. 2016) (citing *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) and *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014)). When analyzing reasonableness, courts balance, on one hand, the degree to which the search or seizure intrudes upon an individual's privacy and, on the other, the degree to which the

---

[3] To the extent Plaintiff sought to assert Count I against the other individual Defendants—Bliss and Hartzell—such claims fail for lack of personal involvement. *See Pineda*, 977 F.3d at 491 ("In the face of a motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." (cleaned up)). Defendants Bliss and Hartzell did not participate in the allegedly unconstitutional search and seizure.

[4] Confusingly, Count I of Plaintiff's initial Complaint is titled "Violation of Due Process Under 42 U.S.C. § 1983," but the substance of the allegations within Count I resembles a Fourth Amendment unreasonable search and seizure claim, rather than a Fourteenth Amendment due process claim. *See* ECF No. 33 at PageID.1455–56 (alleging "Defendants Zimba and Markel forced [Plaintiff] to strip his clothing to search his person and possessions" and "Defendants violated [Plaintiff]'s right to be free from unreasonable search and seizure"); *see also Locklear v. Vascor, Ltd*., No. CIV.A. 11-12832, 2012 WL 1806157, at *2 (E.D. Mich. May 17, 2012) (noting Courts look to "the substance" "and the theory underlying" claims "rather than labels attached . . . by Plaintiff").

search or seizure is necessary to effectuate a legitimate government interest. *United States v. Knights*, 534 U.S. 112, 119 (2001).

### 1. December 6, 2021 Search

Plaintiff first alleges that Defendants Zimba, Markel, and CCPS unreasonably *searched* his backpack, locker, and person on December 6, 2021, after receiving reports of his allegedly threatening remark. ECF No. 33 at PageID.1456. But all aspects of the search were sound.

"Determining the reasonableness of any search involves a twofold inquiry." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985). First, courts consider whether the search was justified at its inception. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Second, courts determine whether the search "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* As recognized by the Supreme Court:

> Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*T.L.O.*, 469 U.S. at 341–42 (footnotes omitted). School officials do not need probable cause to justify a search of a student at its inception. *Id.* at 340–41. Indeed, recognizing the difference between school and law enforcement officials, the Supreme Court describes "[t]he lesser standard" to justify school searches as a "moderate chance of finding evidence of wrongdoing." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009).

### a. Justification

The December 6, 2021 search of Defendant's person, backpack, and locker was justified at inception. Understandably, CCPS prohibits students from possessing firearms at school. ECF No.

17-5 at PageID.384, 394–95. Michigan law does, too. *See* MICH. COMP. LAWS § 750.237a (prohibiting students from possessing firearms at school unless they have a license or receive permission from the principal). Although the exact wording of Plaintiff's remark is disputed, it is undisputed that at least three students alerted CCPS staff and administration that Plaintiff made a threatening remark about having a firearm or bringing one to school. D.H. told CCPS teachers that he heard Plaintiff say, "I have a gun." ECF No. 17-10 at PageID.660; *see also id.* at PageID.654–55 (recalling Plaintiff said "he had guns and that if he had brought them to the school, nobody would do anything about it" but testifying that D.H. understood this statement to mean Plaintiff "had a gun with him that day in school"). R.B. told her mom—Defendant Stacey Bliss—and a CCPS teacher that she "didn't feel safe" because Plaintiff said he was "thinking about" or "was going to bring a gun to school" and she knew he had "access to guns." ECF Nos. 18-1 at PageID.711–12, 724, 729; 18-3 at PageID.761. Defendant Bliss then called Defendant Superintendent Zimba and told her that R.B. "overheard . . . [Plaintiff] had a weapon or potentially a weapon and . . . didn't feel safe at school." ECF No. 18-6 at PageID.906. Around the same time, the parents of another student, H.O., called Defendant Principal Hartzell and reported Plaintiff's remark. ECF No. 17-8 at PageID.484–85; *see also* ECF No. 18-5 at PageID.895.

This provided Defendants Zimba and Hartzell with reasonable suspicion that Plaintiff was violating, at least, school rules and, at most, Michigan law by possessing a firearm on CCPS grounds. *See Wofford v. Evans*, 390 F.3d 318, 326 (4th Cir. 2004) (finding reasonable suspicion for school officials to search a ten-year-old plaintiff when another student reported plaintiff brought a gun to school); *see also T.L.O.*, 469 U.S. 325, 367 (1985) (Brennan, J., concurring) ("A teacher or administrator who had reasonable suspicion that a student was carrying a gun would no doubt have authority under ordinary Fourth Amendment doctrine to conduct a limited search of the student to

- 19 -

determine whether the threat was genuine."). Indeed, this Court has found reasonable suspicion to justify a student search on far less. *See Johnson ex. rel X.M. v. Mount Pleasant Pub. Sch.*, 745 F. Supp. 3d 479, 506 (E.D. Mich. 2024) (concluding search of student-plaintiff was justified at its inception when the school received only *one* report from another student that the plaintiff brought a gun to school).

### b. Scope

Plaintiff does not dispute that the December 6, 2021 search was justified at its inception. *See* ECF No. 38. Instead, Plaintiff focuses on the second reasonableness inquiry and argues that the search was unreasonable in scope. *See id.* at PageID.1597–602. This argument lacks merit. Plaintiff was only confined in the CCPS office for 30 minutes. *See* ECF No. 18-4 at PageID.827 (noting Plaintiff arrived in the office around "11:35" AM and "was out of there just after 12:00"). And the search of his backpack, locker, and person lasted no more than "ten minutes." *Id.* at PageID.823. All aspects of the search were minimally intrusive and reasonably related to ensuring Plaintiff did not have a firearm on his person or school grounds.

 Start with the search of Plaintiff's locker and backpack. Because a weapon could be stored in either location, Defendant's brief search of both is reasonable. *See, e.g., Johnson*, 745 F. Supp. 3d at 507 (finding cursory search of the student plaintiff's locker was reasonable in scope after the plaintiff's classmates reported that he brought a gun to school); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 196 (E.D.N.Y. 2008) (concluding defendant's brief search of student's backpack was reasonable in scope when defendants had reasonable suspicion that the student set a fire on school grounds, noting "basic search[es] of [a plaintiff's] belongings for evidence of [their] involvement" in the suspected offense are reasonable under the Fourth Amendment); *Greenleaf ex rel. Greenleaf v. Cote*, 77 F. Supp. 2d 168, 171 (D. Me. 1999) (concluding search of locker and backpack were

reasonable because "evidence of" the student plaintiff's alleged offense "could be found in the places searched").

Next, consider the search of the Plaintiff's person. Either Defendant McComb, Markel, or Zimba asked Plaintiff to remove his sweatshirt and boots. *See* ECF No. 17-7 at PageID.427. Again, because a firearm could be concealed under a sweatshirt or in a boot, Defendants' request was reasonably related to the objective of Defendants' search: ensuring Plaintiff did not have a gun on his person. And this search was minimally intrusive. Plaintiff concedes that "no one touched [him]" throughout the search of his person. ECF No. 17-9 at PageID.626; *see also* ECF No. 17-7 at PageID.427 (noting Plaintiff was not frisked). Further reflecting reasonableness, the search of Plaintiff's person occurred in a private setting, free from other students. *See Greenleaf*, 77 F. Supp. 2d at 171. Although disputed, Plaintiff claims that he was asked to lift his shirt and move his waistband. *Compare* ECF No. 17-9 at PageID.625 *with* ECF No. 18-4 at PageID.820.

But even assuming this disputed fact in Plaintiff's favor, the search was not violative. Plaintiff recognizes that lifting his shirt and moving his waistband would be reasonably related to the objective of Defendants' search. ECF No. 17-9 at PageID.625–26 (explaining that Defendants asked him to lift his shirt and move his waistband because "they wanted to make sure that [he] didn't have [a gun]" and so "they knew [he] wasn't, like, concealing [a firearm] in [his] waistband or nothing" ). And because this disputed waistband stretch was limited to Plaintiff's *pants*—as opposed to *underpants*—the search cannot be classified as an overly intrusive "strip search." *See, e.g.*, *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 376 (2009) (finding a search too intrusive when school officer asked student to pull out the elastic on her *underwear* "exposing her . . . pelvic area" when there was only reasonable suspicion that the student possessed drugs, a form of "*nondangerous* school contraband"). And even then, some strip searches are reasonable in scope

if a defendant has reasonable suspicion that a student possesses dangerous contraband such as a firearm. *See id.*; *D.H. by Dawson v. Clayton Cnty. Sch. Dist.*, 830 F.3d 1306, 1317 (11th Cir. 2016) (noting school officials could reasonably search a student suspected of possessing drugs by "requir[ing them] to pull the waistband of [their] underpants away from [their] body"). Defendants' December 6, 2021 search of Plaintiff's person, locker, and backpack was reasonable in scope.

Plaintiff makes several arguments to the contrary. All are misplaced. First, Plaintiff argues that the searches were unreasonable in scope because Defendants never advised him of the "allegations against him" nor read him his *Miranda* rights.[5] ECF No. 38 at PageID.1599. But neither is necessary to comport with the Fourth Amendment. Indeed, *Miranda* warnings arise from the *Fifth Amendment* and are intended to protect a suspect in custodial interrogation from incriminating themselves. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). An officer's failure to advise a suspect of their *Miranda* rights does not deprive that suspect's constitutional rights—only the admission of the suspect's subsequent confessions could. *See id.* at 492; *Vega v. Tekoh*, 597 U.S. 134, 150 (2022) (holding an officer's failure to advise a suspect of their "prophylactic" *Miranda* rights "does not constitute" a deprivation of rights under 42 U.S.C. § 1983).

Plaintiff then argues the searches were unreasonable because Defendants did not call his parents or advise him of his "rights" in violation of CCPS policy pertaining to student searches. ECF No. 38 at PageID.1600. True, the CCPS policy requires school officials to "make reasonable attempts to contact a student's parent/guardian before the student is questioned by law enforcement" and notes that the questioning law enforcement officer should "advise the student of

---

[5] Contrary to his argument, Plaintiff testified at his deposition that, before the December 6 search, Defendant Markel told him that CCPS had a "suspicion that [he] had a gun[.]" ECF No. 17-9 at PageID.625.

all applicable rights." ECF No. 19-1 at PageID.1126–27. But "such violation of school policy does not . . . render the search a violation of federal constitutional rights." *Rudolph ex rel. Williams v. Lowndes Cnty. Bd. of Educ.*, 242 F. Supp. 2d 1107, 1116 (M.D. Ala. 2003); *see also* 42 U.S.C. § 1983 (limiting cognizable claims to deprivations of rights "secured by the Constitution," not school rules). At bottom, Defendants' December 6, 2021, search of Plaintiff's locker, backpack, and person accorded with the Fourth Amendment.

### 2. December 6, 2021 Seizure

Plaintiff also alleges Defendants Zimba, Markel, and CCPS unreasonably seized him on December 6, 2021 by detaining and questioning him in the CCPS office. ECF No. 33 at PageID.1455. Not so.

A Fourth Amendment "seizure" typically occurs when a government official uses physical force or a show of authority to intentionally terminate or restrain a person's freedom of movement. *Brendlin v. California*, 551 U.S. 249, 254 (2007). But courts "must think about seizures differently in the school context, as students are generally not at liberty to leave the school building when they wish." *Crochran through Shields v. Columbus City Sch.*, 748 F. App'x 682, 685 (6th Cir. 2018) (quoting *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1250–51 (10th Cir. 2008)). Accordingly, "[t]o qualify as a seizure in the school context, the limitation on the student's freedom of movement must significantly exceed that inherent in every-day compulsory attendance." *Id.* (quoting *Couture*, 545 F.3d at 1251).

Defendants "seized" Plaintiff on December 6, 2021, by confining him in the CCPS main office for approximately 30 minutes as they searched and questioned him. True, in a way, Plaintiff voluntarily went to the CCPS office to wait for his grandmother to pick him up after he called his mother and requested to be picked up because he was feeling sick. ECF Nos. 17-9 at PageID.623–

24; 17-2 at PageID.201. And true, many Defendants maintain Plaintiff was free to leave the office at any time. *See, e.g.*, ECF No. 17-4 at PageID.292 (testifying that Plaintiff "had a choice" to participate in the searches and answer Lieutenant McComb's questions); 17-7 at PageID.426 (testifying Plaintiff "was free to walk out of the room"). But Defendant Zimba testified that, once she, Defendant Markel, and Lieutenant McComb entered the CCPS office and began questioning Plaintiff, his "presence was required." ECF No. 18-4 at PageID.865. Indeed, Plaintiff testified that he was "scared because there was a cop there." ECF No. 17-9 at PageID.625. And Plaintiff did not leave the CCPS office when his grandmother arrived; he was allowed to leave only after Defendants concluded their questions and search. *See* ECF Nos. 18-4 at PageID.817 (noting Defendants told Plaintiff they "need[ed] a couple more minutes of [his] time" when his grandmother arrived to pick him up); 17-9 at PageID.631 (testifying that Plaintiff was escorted out of the CCPS office to his grandmother's car and that Defendant Markel explained to Plaintiff's grandmother "why it took so long").

But only unreasonable seizures violate the Fourth Amendment. Like searches, seizures are unreasonable if they are unjustified at their inception or unreasonable in scope. *Crochran ex rel. Shields v. Columbus City Sch.*, 748 F. App'x 682, 685 (6th Cir. 2018). No reasonable juror could conclude this seizure was unjustified or exceeded a permissible scope. As explained, Defendants had reasonable suspicion that Plaintiff possessed a firearm on school grounds. *See supra* Section III.A.1.a. The resulting 30-minute detention lasted no longer than necessary to ensure Plaintiff did not have a gun on his person or in his locker or backpack, and to question Plaintiff about the alleged threatening remark. This minimally intrusive seizure is reasonable and does not violate the Fourth Amendment. *See, e.g.*, *Wofford v. Evans*, 390 F.3d 318, 326–27 (4th Cir. 2004) (finding school officials reasonably seized a student because officials "had reason to believe that the student had

brought a gun to school" and the detention lasted "no longer than necessary to . . . confirm that she had no gun on her person or in her schoolroom desk"); *Edwards ex rel. Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989) (finding school officials reasonably seized student by detaining him in the school's office for 20 minutes to question him about a bomb threat); *Milligan v. City of Slidell*, 226 F.3d 652, 653 (5th Cir. 2000) (same, when officials detained students in an office for "ten to fifteen minutes" to question them about a reported violent fight on school grounds).

In sum, Defendants Markel and Zimba reasonably searched and seized Plaintiff on December 6, 2021. Because Plaintiff's Fourth Amendment rights were not violated, this Court need not analyze qualified immunity or Defendant CCPS's municipal liability under *Monell*. All Defendants are entitled to summary judgment on Count I.

## B. Fourteenth Amendment Due Process

In Count II, Plaintiff alleges all Defendants deprived him of due process in violation of the Fourteenth Amendment and § 1983. ECF No. 33 at PageID.1457–60. But Plaintiff was afforded substantive due process. And although material questions of fact permeate one of his two procedural due process claims, all personally involved Defendants are entitled to qualified immunity and Plaintiff cannot hold Defendant CCPS liable as a municipality under *Monell*.

The Fourteenth Amendment prohibits the Government from depriving "any person of life, liberty, or property" without affording that person "due process of law." U.S. CONST. amend. XIV. But Fourteenth Amendment due process comes in two forms: procedural and substantive. *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000)

To succeed on both procedural and substantive due process claims, a plaintiff must first establish that defendants deprived them of a life, liberty, or property interest. *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 437 (6th Cir. 2006). Here, as Defendants recognize, this threshold

showing is satisfied. *See* ECF No. 36 at PageID.1532–33. Michigan provides its citizens with a

right to "free public elementary and secondary schools." MICH. COMP. LAWS § 380.1281a (cross-

referencing MICH. CONST. art. VIII, § 2). So Michigan students—like Plaintiff—"have a legitimate

property interest in educational benefits and, therefore, in actually attending school." *Laney v.*

*Farley*, 501 F.3d 577, 581 (6th Cir. 2007) (citing *Goss v. Lopez*, 419 U.S. 565 (1975)). Expulsion

deprives this interest because it "total[ly] exclu[des] [the student] from the educational process."

*Goss*, 419 U.S. at 576. Beyond this threshold issue, the doctrines of procedural and substantive

due process diverge. So each doctrine will be discussed separately.

### 1. Substantive Due Process

Begin with substantive due process. "Substantive due process is the doctrine that

governmental deprivations of life, liberty, or property are subject to limitations regardless of the

adequacy of the procedures employed." *Johnson v. City of Saginaw*, 980 F.3d 497, 513 (6th Cir.

2020) (internal quotations omitted). "Upon a showing of a deprivation of a constitutionally

protected . . . interest, a plaintiff must show [that] the government's discretionary conduct that

deprived that interest was constitutionally repugnant." *Guertin v. State*, 912 F.3d 907, 922 (6th Cir.

2019). "While different formulations for constitutional repugnancy exist, the Sixth Circuit

routinely recognizes substantive due process violations when discretionary government action is

arbitrary and capricious, willful and unreasoning, conscience-shocking, or extremely irrational."

*Novak v. Federspiel*, 728 F. Supp. 3d 552, 574 (E.D. Mich. 2024) (collecting cases).

Plaintiff's substantive due process theory is largely unclear. In his Amended Complaint,

Plaintiff cursorily alleges his "expulsion was arbitrary [and] capricious." ECF No. 33 at

PageID.1459. In response to Defendants' Renewed Motion for Summary Judgement, Plaintiff

abandons that theory and instead argues—without citing the record or any legal authority—that

his expulsion "shocks the conscience." ECF No. 38 at PageID.1607. Although the Sixth Circuit has historically conflated the two, some decisions suggest the "shocks-the-conscience" standard is separate and distinct from the arbitrary and capricious analysis. *See Johnson*, 980 F.3d at 513 n.10; *but see Cooperrider v. Woods,* 127 F.4th 1019, 1041 (6th Cir. 2025) (conflating the two). This Court follows suit.

### a. Arbitrary and Capricious

An action is arbitrary and capricious for substantive due process purposes if it lacks any rational basis. *Am. Exp. Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 689 (6th Cir. 2011) (citing *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 613 (6th Cir. 2010)). "In the context of school discipline, a substantive due process claim will succeed only in the rare case where there is no rational relationship between the punishment and the offense." *Seal*, 229 F.3d at 575 (cleaned up). This is not the rare case. The CCPS Board rationally expelled Plaintiff, for at least three reasons.

First, both the CCPS Administration—Superintendent Zimba, Principal Hartzell, and Behavioral Officer Markel—and the CCPS Board—including Defendant Bliss—considered the interviews of several students who reported that Plaintiff made a threatening remark about bringing a firearm to school. *See* ECF No. 38-9 at PageID.1953 (reporting Plaintiff said he was "thinking about bringing a gun one of these days"), PageID.1954 (reporting Plaintiff said he had something in his locker that "started with the letter 'G'"), PageID.1955 (reporting Plaintiff said he "was going to" bring a "fake but metal gun" to school), PageID.1956 (reporting Plaintiff stated "he had a gun in his bag" after instigating a fight with the interviewee student); *see also* ECF No. 17-10 at PageID.661–622 (testifying that Plaintiff said he "had a gun" at school).

Second, the CCPS Board considered Plaintiff's history of misconduct. On this point, it is important to remember that Plaintiff was not expelled *solely* for making a threatening remark about a gun. This eight-point remark only triggered the expulsion hearing when *added to* the seven disciplinary points Plaintiff had already accumulated throughout his eighth-grade year. *See* ECF Nos. 17-3; 17-5 at PageID.381. And the CCPS Board considered both the instant threatening remark *and* Plaintiff's disciplinary history when deciding to expel him. ECF No. 19-1 at PageID.1130; *see also* ECF No. 17-8 at PageID.519; 553–54; 18-9 at PageID.1002. As explained, Plaintiff's disciplinary history was substantial. *See supra* Section I.C (detailing how, in his eighth-grade year, Plaintiff called another student a "stupid bitch," touched a female student's breasts after she told him to stop, repeatedly distracted class and refused instruction, was excessively tardy, made fun of another female student by waving his hands over his face and telling her to "close her legs," and used a facemask to slingshot sharpened pencils at other students).

Third, the CCPS Board and Administration also considered the severity of Plaintiff's remark. ECF No. 19-1 at PageID.1130. Multiple Defendants and MSP Lieutenant McComb testified that the recency and proximity of the November 30, 2021 Oxford shooting rendered Plaintiff's remark significantly more serious. *See* ECF Nos. 17-7 at PageID.453–54 (agreeing that "a threat of a gun at school, whether currently or the threat of brining one in the future" was more serious surrounding Oxford because "schools across the state were receiving a number of similar threats from . . . copycats"); 18-4 at PageID.803; 17-8 at PageID.517–18. The Sixth Circuit would agree.

In *C.S. v. McCrumb*, No. 24-1364, 2025 WL 1276036 (6th Cir. May 2, 2025), the Sixth Circuit recently recognized how the Oxford shooting "heightened" the severity of student threats involving firearms at nearby Michigan public schools. In that case, unlike here, the Sixth Circuit

was analyzing whether school officials violated a student's First Amendment rights by asking him to remove a hat that displayed an AR-15 rifle and the words "come and take it." *Id.* at *2. But, like here, the allegedly offensive student conduct had a close "spatial and temporal" relationship to Oxford. *Id.* at *5. There, the Michigan public school was located "less than a one-hour drive" from Oxford Township, and the student wore the hat "less than three months" after the Oxford shooting. *Id.* The Sixth Circuit found that this "striking closeness lend[ed] context" to the school's decision, and rendered that decision reasonable. *Id.*

But the closeness here is even more striking. Although CCPS is located 30 minutes farther away from Oxford compared to the school in *McCrumb*, Plaintiff made his threatening remark about a firearm *less than one week* after the Oxford shooting. *See supra* Section I.A. Moreover, Plaintiff made this remark on a day the CCPS Administration dedicated to discussing the tragedy with its students and teaching them about school shooting safety and resources. *Id.* Indeed, it is undisputed that Plaintiff made the remark when he and other students "were all talking about . . . Oxford." ECF No. 17-7 at PageID.443; *see also* ECF Nos. 17-9 (noting CCPS students did not talk about Oxford until "the day of the video"); 17-10 at PageID.662–64; 17-11 at PageID.692–93; 18-1 at PageID.722–23; 18-2 at PageID.752.

True, at least one aspect of Plaintiff's discipline appears arbitrary, as that term is commonly understood. *See Arbitrary*, MERIAM-WEBSTER, https://www.merriam-webster.com/dictionary/arbitrary (last visited May 1, 2025) (defining the term as "depending on individual discretion . . . and not by fixed standards [or] rules"). It remains unclear why Defendants Zimba, Markel, and Hartzell decided to classify Plaintiff's alleged threatening remark as "gross misbehavior" warranting *eight* disciplinary points, especially considering that Plaintiff would not have been referred for an expulsion hearing had he been awarded even one less point. *See supra* Section I.C.

But "[i]t is not the role of federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975). Indeed, to violate substantive due process, a defendant's decision must be arbitrary and capricious in the "strict" or "constitutional" sense. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Johnson v. Morales*, 946 F.3d 911, 932 (6th Cir. 2020). "[O]nly the most egregious official conduct" satisfies this standard. *Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). No reasonable juror could conclude such standard is satisfied, here.

### b. Shocks the Conscience

Nor could a reasonable juror conclude that Plaintiff's expulsion shocks the conscience. Conscience-shocking conduct—although incapable of precise definition, *Lewis*, 523 U.S. at 847, has been described as conduct that (1) infringes on the "decencies of civilized conduct," (2) is "so brutal and so offensive to human dignity," or (3) interferes "with rights implicit in the concept of ordered liberty." *Guertin v. State*, 912 F.3d 907, 923 (6th Cir. 2019) (collecting cases). As these descriptions reveal, conscience-shocking conduct is reserved for seriously egregious behavior, and the subjective "shocks-the-conscience test" should be narrowly employed by courts to "prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees." *Id.*

Plaintiff argues that his expulsion was conscience-shocking because (1) "he never had a weapon on school property," (2) he "never had access to any weapons," and (3) Defendant Zimba "knew" about MSP's independent conclusion that "[he] posed no threat to the school environment." ECF No. 38 at PageID.1607. This argument is misplaced. Plaintiff was not expelled for bringing a gun to school. He was expelled in part because, in the CCPS Administration and Board's view, he *threatened* to do so. ECF No. 19-2 at PageID.1147. Whether Plaintiff actually had access to a gun to carry out this threat is irrelevant, particularly from the perspective of the

students he allegedly threatened, some of whom believed the threat was very real based on prior conversations with Plaintiff. *See* ECF No. 18-1 at PageID.728–29 (noting Plaintiff "told" the testifying student "before that he has access to guns" and "could just go get one"). And Plaintiff has not otherwise argued—let alone shown—that his expulsion infringes on the decencies of civilized conduct or notions of human dignity.

In short, no genuine question of material fact supports Plaintiff's substantive due process claim.

### 2. Procedural Due Process

Pivot to procedural due process. At its core, procedural due process requires "notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Garcia v. Fed. Nat. Mortg. Ass'n*, 782 F.3d 736, 741 (6th Cir. 2015) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). But "the timing and content of the notice and the nature of the hearing . . . depend on appropriate accommodation of the competing interests involved." *Goss*, 419 U.S. at 579. "In the context of disciplining public school students, the student's interest is 'to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences.'" *Seal*, 229 F.3d at 574 (quoting *Goss*, 419 U.S. at 579). On the other hand, schools have an "unquestionably powerful interest in maintaining the safety of their campuses and preserving the ability to pursue their educational mission." *Id.*; *see also Goss*, 419 U.S. at 580 ("Some modicum of discipline and order is essential if the educational function is to be performed. Events calling for discipline are frequent occurrences and sometimes require immediate, effective action."). Because his property interest in attending school was undisputedly deprived, Plaintiff need only prove that this deprivation occurred without adequate process. *Fields v. Henry Cnty., Tenn.*, 701 F.3d 180, 185 (6th Cir. 2012).

Defendants seek summary judgment because Plaintiff was given notice of the expulsion hearing and had an opportunity to be heard at the hearing because he appeared with counsel and could have presented witnesses and testimony contesting the Administration's findings of fact and the propriety of expulsion. ECF No. 36 at PageID.1534. All true.[6] But Plaintiff argues Defendants deprived him of procedural due process because his opportunity to be heard was not "meaningful" for two separate reasons. Each will be addressed in turn.

### a. Nondisclosure of MSP's Conclusions

First, Plaintiff argues the expulsion hearing was "defective" because the Board was required to assess whether Plaintiff's behavior posed a safety risk yet did not know about—because Defendant Zimba did not share—MSP's independent conclusion that the school was not in immediate danger because he had no access to a gun. ECF No. 33 at PageID.1458–59. Plaintiff's point is well-taken.

It is well-established that the Fourteenth Amendment protects students from being excluded from school based on "unfair or mistaken findings." *Goss*, 419 U.S. at 581; *accord Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 566 (6th Cir. 2011). Here, it is undisputed that MSP concluded—after its own investigation—that Plaintiff's remark "may have been misunderstood"

---

[6] In a one-sentence argument in response to Defendants' Renewed Motion for Summary Judgment, Plaintiff suggests he did not receive proper notice because he did not know "why he was being put up for expulsion." ECF No. 38 at PageID.1606. But Plaintiff did not raise this claim in his Amended Complaint, *see* ECF No. 33, and the record reflects that Defendant Zimba sent Plaintiff and his parents a letter explaining that the CCPS Administration concluded Plaintiff made a threatening remark at school which triggered an expulsion-hearing referral. ECF No. 18-8 at PageID.967. Plaintiff also argues that he was deprived of procedural due process because the Board did not provide him with a written explanation of its "Mandatory 7 Factors" analysis." ECF No. 38 at PageID.1606. Although this may violate CCPS Policy, ECF No. 19-1 at PageID.1131, it does not violate the Fourteenth Amendment. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 642 (6th Cir. 2005) (concluding students do "not have a constitutional right to written findings of fact," especially when the student has the opportunity to be heard at a "verbal" hearing).

and that, regardless of whether he made a threatening remark, the school was not in "immediate danger." ECF Nos. 18-4 at PageID.829; 25-2 at PageID.1319. It is undisputed that MSP shared this conclusion with Defendant Zimba on the evening of December 6, 2021—before she and Defendants Hartzell and Markel decided to refer Plaintiff for an expulsion hearing. *Id.* Yet it is undisputed that Defendant Zimba did *not* share MSP's conclusion with the CCPS Board before Plaintiff's expulsion hearing. *See* ECF No. 18-6 at PageID.928–30. This nondisclosure may have resulted in Plaintiff's mistaken expulsion because, under the express provisions of its own policy, the CCPS Board was *required* to assess whether Plaintiff "posed a safety risk" to the school when deciding whether to expel him or issue some lesser punishment. ECF No. 19-1 at PageID.1130.

Defendants respond that they are still entitled to summary judgment because Plaintiff has not shown that the Board would have reached a different decision had they known about MSP's conclusion. ECF No. 36 at PageID.1535–36. True, whether Plaintiff "posed a safety risk" was only one of seven factors the Board was required to consider when deciding how to punish Plaintiff. ECF No. 19-1 at PageID.1130. And true, as Defendant Zimba testified, whether Plaintiff's behavior posed a safety risk to the school is broader than MSP's narrow conclusion that he did not have access to a gun such that the school was not in "immediate danger." *See* ECF No. 18-4 at PageID.829–30. So, even if the Board knew about MSP's conclusions, it still may have decided to expel Plaintiff. But maybe not. Indeed, contrary to Defendants' characterization of the record, two of the three Board members deposed in this case—Defendant Bliss and Janie Meeker—agree that MSP's conclusion would have at least been important when deciding whether to expel Plaintiff. ECF Nos. 18-6 at PageID.911; 18-9 at PageID.990, 1014–15 ("[I]t would've been part of the decision-making process, but I don't think it would've changed our decision."). The *weight* the

Board would have afforded to MSP's conclusions had it known about them is a fact issue that would normally survive summary judgment.

Here's the problem: only Defendants Zimba and CCPS could theoretically be liable on this specific procedural due process claim.[7] *See* ECF No. 33 at PageID.1458. But the former is entitled to qualified immunity and the latter is not liable under *Monell*.

As explained, the doctrine of qualified immunity shields individual defendants from § 1983 liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Getz*, 833 F.3d at 652 (6th Cir. 2016) (quoting *Harlow*, 457 U.S. at 818). To defeat Defendant Zimba's claim of qualified immunity, ECF No. 36 at PageID.1537, Plaintiff has the burden of demonstrating that she violated clearly established law. *See Hart*, 973 F.3d at 635 (6th Cir. 2020); *Lubelan*, 476 F.3d at 403. Plaintiff has not even attempted to meet this burden. Instead, Plaintiff argues:

> The right to due process was clearly established at the time of the violation. This can be supported by the Defendants' own materials as well as the general knowledge of due process held by the Defendants as members of the school board and Cass City schools administration.

ECF No. 38 at PageID.1609. Plaintiff's "right to due process" is far too general for qualified immunity purposes. *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005) ("The constitutional right cannot simply be a general prohibition."). Instead, "the right the official is alleged to have violated must be 'clearly established' in a more particularized . . . sense: The contours of the right must be

---

[7] Plaintiff does not allege that individual Defendants Hartzell, Markel, and Bliss knew about MSP's conclusions but failed to disclose them to the Board. *See* ECF No. 33 at PageID.1458. Because Plaintiff has not even attempted to show how these individual Defendants were involved in this particular procedural due process theory, Defendants Hartzell, Markel, and Bliss are entitled to summary judgment. *See Pineda*, 977 F.3d at 491 ("[I]n the face of a motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." (cleaned up)).

sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Properly particularized, Plaintiff's two-sentence argument does not cite any legal authority, let alone clearly established legal authority, to place Defendant Zimba on reasonable notice that failing to disclose MSP's conclusions to the Board would deprive Plaintiff of procedural due process. *See Sutton*, 700 F.3d at 876 (noting sources of clearly established law include Supreme Court precedent, Sixth Circuit precedent, this Court's precedent, or a consensus from "other circuits" when "directly on point").

Plaintiff cites *Newsome v. Batavia Loc. Sch. Dist.*, 842 F.2d 920 (6th Cir. 1988) in passing when discussing applicable due process standards. ECF No. 38 at PageID.1603. But that case is inapposite. There, a student was expelled for possessing and selling marijuana on school grounds. *Newsome*, 842 F.2d at 921–22. The superintendent defendant knew that the student confessed his marijuana possession to his counselor. *Id.* Rather than present this confession to the student to confront during his expulsion hearing, the superintendent waited and only disclosed the confession to the school board after the hearing, when the board was deliberating in private. *Id.* "Such a tactic," the Sixth Circuit held, "deprived [the student plaintiff] of any opportunity to rebut the evidence" against him, and thus "amounted to a clear deprivation of [the student's] right to procedural due process." *Id.* at 928. But no similar tactic occurred in this case. Defendant Zimba's *nondisclosure* of MSP's independent conclusion did not deprive Plaintiff of his ability to rebut the evidence against him. Neither *Newsome* nor any other identifiable precedent places the unconstitutionality of Defendant Zimba's conduct "beyond debate." *Ashcroft*, 563 U.S. at 741. So she is entitled to qualified immunity on Plaintiff's procedural due process claim.

Defendant CCPS is similarly spared liability, albeit for a different reason. Recall that, under *Monell*, municipalities like CCPS can only be liable under § 1983 if their official policies cause a

constitutional deprivation. Plaintiff does not mention *Monell* in his Amended Complaint and instead argues—under a heading titled "respondeat superior and agency"— that, "[u]nder [f]ederal law," CCPS is "vicariously liable" for the individual Defendants' actions taken "within the scope of their employment with CCPS." ECF No. 33 at PageID.1454. This ignores the first and most basic rule in the *Monell* manual: "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. In response to Defendants' Renewed Motion for Summary Judgment, Plaintiff pivots and argues—without any citations to the record or precedent—that Defendant Zimba "is the final decision making authority" for CCPS and "ratified the illegal actions of the [B]oard." ECF No. 38 at PageID.1610–11. More is required. Without question, municipalities may be liable for § 1983 violations under *Monell* when a municipal official with "final decision-making authority" ratifies illegal actions. *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014). But Plaintiff has presented no evidence that Defendant Zimba had final decision-making authority over Plaintiff's expulsion. Nor could he. Defendant Zimba did not make the final decision to expel Plaintiff—the CCPS Board did, after Defendants Zimba, Markel, and Hartzell referred Plaintiff to the Board for an expulsion hearing. *See supra* Section I.C.

At bottom, a reasonable question of fact exists as to whether Plaintiff was deprived of procedural due process because the Board did not know about MSP's independent conclusion that he had no access to guns and did not impose "immediate danger" to the school. But Plaintiff has not shown how three of the five Defendants were personally involved in this potential deprivation. The one individual who was—Defendant Zimba—is entitled to qualified immunity. And Plaintiff has now shown that Defendant CCPS is liable for this potential § 1983 violation as a municipality under *Monell*. So, one way or another, all Defendants are entitled to summary judgment on Plaintiff's first procedural due process claim.

**b. Bias Based on Disciplinary History**

In addition to Plaintiff's procedural due process claim predicated on what the Board *didn't know*, Plaintiff also alleges the Board deprived him of procedural due process based on what it *did know*. ECF No. 33 at PageID.1458–59. Specifically, Plaintiff alleges that the Board's receipt of his full disciplinary history before deciding whether he made a threatening remark about a gun biased the Board against him, or prompted the Board to prejudge him.[8] *Id.* at PageID.1458. For clarity, Plaintiff does not suggest the Board should not have considered his disciplinary history whatsoever when deciding how to discipline him for his threat. *See* ECF No. 19-1 at PageID.1130; *supra* Section III.A.1. He instead argues the Board *prematurely* considered this history before deciding the threshold factual issue of whether he made the threat in the first place. *See* ECF No. 33 at PageID.1458–59.

"Procedural due process is not satisfied when . . . the individual[s] responsible for deciding whether to deprive [a] person of his interest [are] biased." *Heyne*, 655 F.3d at 566; *accord Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016). Indeed, it is well-established that "a biased decisionmaker [is] constitutionally unacceptable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). But "[i]t is also well established" that disciplining school officials "are entitled to a presumption of

---

[8] Plaintiff also alleges that the Board was biased because it "allowed" Defendant Bliss "to speak at the expulsion hearing." ECF No. 33 at PageID.1459. But this Court rejected that claim as futile when granting Plaintiff leave to amend his complaint. *Halasz ex rel. H.H. v. Cass City Pub. Sch.*, 748 F. Supp. 3d 482, 496 (E.D. Mich. 2024). Yet Plaintiff included the allegation in his Amended Complaint, ECF No. 33 at PageID.1452–53, and continues to argue Defendant Bliss's "presence [at] th[e] hearing was enough to bias the [B]oard." ECF No. 38 at PageID.1605. As this Court has already explained, it was not enough. Bias for procedural due process purposes must be based on more than mere "inference and speculation." *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 601 (S.D. Ohio 2016) *accord Navistar*, 941 F.2d at 1360; *Cummins*, 662 F. App'x at 449. Plaintiff concedes that Defendant Bliss "recused herself from voting." ECF No. 33 at PageID.1459. And Defendant Bliss testified that she did not discuss Plaintiff's expulsion with *any* other Board member at *any* time. ECF No. 18-6 at PageID.909. Nothing suggests that her mere *presence* at Plaintiff's expulsion hearing biased the Board in any way.

impartiality[.]" *Cummins*, 662 F. App'x at 449. Speculation and inferences of bias are insufficient to rebut this presumption. *Navistar Int'l Transp. Corp. v. U.S. E.P.A*., 941 F.2d 1339, 1360 (6th Cir. 1991). Instead, a plaintiff must provide "convincing evidence that 'a risk of actual bias or prejudgment is present.'" *Id.* (quoting *Withrow*, 421 U.S. at 47).

Plaintiff has not done so. True, it is undisputed that the Board received and reviewed Plaintiff's disciplinary history at the "start of" the expulsion hearing. *See* ECF No. 18-9 at PageID.998. But, contrary to Plaintiff's speculative claims, not a single deposed Board member testified that they considered his disciplinary history when deciding the threshold issue of whether he made a threatening remark about a firearm. Indeed, the only evidence in the record suggests the opposite conclusion: nonparty Board member Janie Meeker testified at her deposition that Plaintiff's disciplinary history "was not part of" the Board's conclusion that Plaintiff made a threatening remark about a gun. ECF No. 18-9 at PageID.1000. Without more, there is no "convincing evidence" in the record to support Plaintiff's claim that the CCPS School Board prejudged him by receiving a copy of his disciplinary history at the start of the expulsion hearing.

And, even if there was, Plaintiff's second procedural due process theory suffers the same fatal flaws as his first. No individual Defendants were personally involved in Plaintiff's purported prejudgment. *See Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) ("[I]n the face of a motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." (cleaned up)). The only Board member named as a Defendant in this case is Stacey Bliss. But Plaintiff concedes that she "recused herself from voting" at Plaintiff's expulsion hearing. ECF No. 33 at PageID.1452. So she could not have plausibly deprived Plaintiff of procedural due process by prejudging him. Moreover, as explained above, Plaintiff has not shown Defendant

CCPS is liable for any constitutional claim—let alone this specific procedural due process claim—under *Monell.*

In sum, Plaintiff's substantive and procedural due process claims do not survive summary judgment. All Defendants are entitled to summary judgment on Count II.

### IV. Plaintiff's Tort Claims

Plaintiff's remaining three claims sound in state tort. But the Michigan Governmental Tort Liability Act (the "GTLA"), MICH. COMP. LAWS § 691.1407 *et seq.*, shields government defendants from tort liability to different extents, depending on the type of defendant and the type of tort. Here, all Defendants are immune from all of Plaintiff's tort claims.

### A.  Defendant CCPS

First, Plaintiff seemingly alleges Defendant CCPS is vicariously liable for the individual Defendants' alleged intentional or negligent infliction of emotional distress (Counts IV and V) and, separately, was negligent in creating and maintaining an educational environment (Count III). *See* ECF No. 33 at PageID.1454, 1461–65.

But the GTLA provides absolute tort immunity to "governmental agenc[ies] . . . engaged in the exercise or discharge of a governmental function[s]." MICH. COMP. LAW § 691.1407(1). Plaintiff does not argue that Defendant CCPS is not a government agency, nor that CCPS was not engaged in governmental functions at all times relevant to his Amended Complaint. *See* ECF No. 38 at PageID.1614–15. Nor could he. The GTLA defines "governmental agenc[ies]" as the state itself or any "political subdivision," expressly including "school district[s]." MICH. COMP. LAWS §§ 191.1401(a), (e). And "the operation of a public school" is a well-established governmental function. *See Reedy ex rel. D.R. v. Huron Sch. Dist.*, No. 2:23-CV-10221, 2025 WL 400226, at *10 (E.D. Mich. Jan. 31, 2025); *see also Tellin v. Forsyth Twp.*, 806 N.W.2d 359, 363 (Mich. Ct.

App. 2011) (noting courts construe "governmental functions" broadly for GTLA purposes). So Defendant CCPS is absolutely immune from Plaintiff's tort claims.

## B. Individual Defendants

The GTLA analysis for individual Defendants is more involved. At all times, the individual government official has the burden to "raise and prove his entitlement to immunity as an affirmative defense." *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008). Because no individual Defendant is a judge, legislator, or high-ranking executive entitled to absolute immunity under MICH. COMP. LAWS § 691.1407(5), their immunity turns on the type of torts Plaintiff pleaded. Each type of Plaintiff's tort claims will be addressed in turn.

### 1.   Intentional Torts

First, Plaintiff pursues an intentional tort in Count IV and alleges that all individual Defendants intentionally inflicted him with "extreme emotional distress" throughout their investigation and his discipline. ECF No. 33 at PageID.1463. When a plaintiff pleads an intentional tort, courts apply the GTLA test articulated by the Michigan Supreme Court in *Ross v. Consumers Power Co.*, 363 N.W.2d 641 (Mich. 1984). *Odom*, 760 N.W.2d at 228 Under this test, the individual defendant is immune when (a) their actions were undertaken during the course of their employment and they were acting, or reasonably believed that he was acting, within the scope of their authority, (b) their actions were undertaken in good faith, or were not undertaken with malice, and (c) their actions were discretionary, as opposed to ministerial. *Odom*, 760 N.W.2d at 228. The second prong—good faith—is subjective and considers the perspective of the individual defendant at the time of their challenged conduct. *Latits v. Phillips*, 826 N.W.2d 190 (Mich. Ct. App. 2012). Relevant to the third prong, discretionary acts are those requiring "personal deliberation, decision

and judgment." *Ross*, 363 N.W.2d at 668. In contrast, ministerial acts involve "an obedience to orders or the performance of a duty in which the individual has little or no choice." *Id.*

All boxes are ticked here. Defendants' allegedly tortious conduct occurred during the course of each Defendant's employment with CCPS. And school officials act within the scope of their authority when investigating and disciplining student misconduct. *See Doe v. N. Michigan Univ.*, 393 F. Supp. 3d 683, 700 (W.D. Mich. 2019). Plaintiff has presented no evidence suggesting, and the record does not support, that Defendants acted with malice or in bad faith. To the contrary, all individual Defendants were investigating and disciplining a student whom they "subjectively believed" made a threatening remark about bringing a firearm to school, "mere days" after the Oxford shooting, "at a neighboring school." *See Reedy ex rel. D.R. v. Huron Sch. Dist.*, No. 2:23-CV-10221, 2025 WL 400226, at *10 (E.D. Mich. Jan. 31, 2025) (finding school officials were immune from plaintiff's intentional infliction of emotional distress claim when they investigated and disciplined student plaintiff for making a threatening remark about guns in the wake of the Oxford shooting). Lastly, all challenged conduct was discretionary, as opposed to ministerial. *See id.* Plaintiff does not argue otherwise. *See* ECF No. 38 at PageID.1614–15. So, all Defendants are immune from Plaintiff's intentional infliction of emotional distress claim.

And, even if Defendants were not immune, Plaintiff's intentional-infliction-of-emotional-distress claim fails on the merits. This tort requires Plaintiff to prove, among other elements, that Defendants' conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Hayley v. Allstate Ins. Co.*, 577, 686 N.W.2d 273, 277 (Mich. Ct. App. 2004). No reasonable juror could conclude, after reviewing the undisputed facts, that Defendants' conduct

was so outrageous and extreme. All Defendants are entitled to summary judgment on Count IV—

Plaintiff's intentional-infliction-of-emotional-distress claim.

### 2. Negligent Torts

But Plaintiff pursues negligent torts, too. In Count III, Plaintiff alleges that the individual

Defendants negligently maintained an unsafe and unfair school environment. No. 33 at

PageID.1461. Specifically, Plaintiff maintains (1) Defendant Markel and Zimba negligently

"failed to notify" Plaintiff's parents of the December 6, 2021 investigation and search, (2)

Defendant Markel negligently "misled" Plaintiff's parents that the school received a report

regarding MSP's independent investigation, (3) Defendant Zimba negligently failed to advise the

Board of MSP's independent conclusions concerning Plaintiff's threat level, and (4) all individual

Defendants negligently failed to consider whether lesser punishments would have been more

appropriate. ECF No. 33 at PageID.1461–62. And, in Count V, Plaintiff alleges all individual

Defendants negligently inflicted emotional distress (NEID) for the same reasons.

The test for negligent tort immunity differs from that for intentional torts under the GTLA.

An individual government defendant is immune from negligent torts if (a) they were acting or

reasonably believed that they were acting within their scope of authority, (b) the governmental

agency was engaged in the exercise or discharge of a governmental function, and (c) the individual

defendant's conduct did not amount to gross negligence that proximately caused the plaintiff's

injury. *Odom*, 760 N.W.2d at 228 (citing MICH. COMP. LAWS § 691.1407(2)).

As explained, the first two prongs are satisfied. All challenged conduct stems from

Defendants' investigation into Plaintiff's threat and subsequent discipline. *See* ECF No. 33 at

PageID.1461–62. This falls within the scope of each individual Defendants' employment with

CCPS. *See Doe*, 393 F. Supp. 3d at 700 (finding school officials were immune from student-

plaintiff's negligent investigation claim because such investigation fell squarely "within the scope of their authority" as school officials). And CCPS—the employing governmental agency— exercised a governmental function: operating and maintaining a public school. *See Reedy*, 2025 WL 400226, at *10. Thus, each individual Defendant's immunity turns on whether their challenged conduct amounted to "gross negligence." MICH. COMP. LAWS § 691.1407(2).

For GTLA purposes, gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MICH. COMP. LAWS § 691.1407(8)(a). Evidence of ordinary negligence is insufficient. *Costa v. Community Emergency Med Servs, Inc*., 716 N.W.2d 236, 240 (Mich. 2006). So are bare allegations that a government official "could have done more" because, "with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Wood v. City of Detroit*, 424, 917 N.W.2d 709, 714 (Mich. Ct. App. 2018).

Plaintiff has not shown sufficiently reckless conduct. Instead, Plaintiff conclusively argues that "[a] trier of fact could easily conclude that Defendants' actions were grossly negligent on their face." ECF No. 38 at PageID.1615. But what actions? How were they grossly negligent? This one-sentence perfunctory assertion is the *only* time Plaintiff mentions gross negligence throughout any of his pleadings, including his Amended Complaint. *See* ECF Nos. 33; 38. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Indeed, "it is not for the court to search the record and construct arguments. Parties must do that for themselves." *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017); *see also McPherson*, 125 F.3d at 995–96 ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."). Although the burden is on the individual Defendants to prove

GTLA immunity, the burden is on Plaintiff—as the nonmovant opposing summary judgment—to "put up or shut up" and point to specific parts of the record that create material questions of fact. *St. v. J.C. Bradford & Co*, 886 F.2d 1472, 1478 (6th Cir. 1989). Plaintiff has put up nothing.[9] Since Plaintiff has waived the issue of gross negligence, all individual Defendants are entitled to GTLA immunity from his negligent tort claims.

Alternatively, even if the individual Defendants were not immune under the GTLA, Plaintiff's negligence and NIED claims fail on the merits. Take negligence, which requires Plaintiff to prove that a specific Defendant owed a duty to him, breached that duty, and that the breach caused Plaintiff's alleged injury. *Case v. Consumers Power Co*., 615 N.W.2d 17 (Mich. 2000). In his Amended Complaint, Plaintiff alleges Defendants had a duty under MICH. COMP. LAWS § 380.10 to "cooperate" with his parents "to develop [his] intellectual capabilities . . . in a safe and positive environment." ECF No. 33 at PageID.1461. Putting aside the fact that no Michigan or federal court has ever held that this statute imposed a duty on school officials, the four specific instances of allegedly negligent conduct that Plaintiff goes on to plead do not breach this purported duty whatsoever. *See id.* at PageID.1461–62 (alleging Defendant Markel and Zimba

---

[9] Even if Plaintiff had shown a material question of fact that any specific Defendant was grossly negligent, he would also have to show a genuine question as to whether that specific Defendant's gross negligence was *the*—as opposed to *a*—proximate cause of his injuries to deprive that Defendant of GTLA immunity. MICH. COMP. LAWS § 691.11407(2)(c). The Michigan Supreme Court promulgated a three-step process for this analysis. *See Ray v. Swager*, 903 N.W.2d 366, 377 (Mich. 2017). The first two steps are obvious: the defendant's gross negligence must be both a factual and proximate—or legal—cause of the plaintiff's alleged injury. *Id.* at 73–75. The third step separates the wheat from the chaff. At the summary judgement stage, "the plaintiff must establish a question of material fact that either (a) no other human actor's negligence proximately caused the injury, or (b) the defendant's gross negligence was a more immediate, efficient, and direct cause of the injury than any other human actor's negligence." *Lippett v. Adray*, No. 18-CV-11175, 2023 WL 3774508, at *7 (E.D. Mich. June 2, 2023) (internal quotations omitted) (citing *Ray v. Swager*, 900 N.W.2d 917, 920 (Mich. Ct. App. 2017)). Plaintiff has not advanced a proximate cause argument, even in a perfunctory manner.

did not notify Plaintiff's parents about Plaintiff's search, Defendant Markel lead Plaintiff's parents to believe that the school received a police report, Defendant Zimba did not advise the Board of MSP's independent conclusions, and Defendants did not consider lesser punishments). In response to Defendants' Renewed Motion for Summary Judgment, Plaintiff abandons § 380.10 and argues—without citing any legal authority—that Defendants owed him a general duty to provide him with an "educational environment that comported with federal and state law." ECF No. 38 at PageID.1611. And Plaintiff goes on to argue—in his response brief—that Defendants breached this new duty in eight new ways—seven of which were not alleged in his Complaint. *See id.* This is impermissible. *Brickles v. Vill. of Phillipsburg, Ohio*, 524 F. Supp. 3d 775, 785 (S.D. Ohio 2021) ("[A] party cannot advance a new claim or cause of action, or expand its claims to assert new theories, in response to a motion for summary judgment."); *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent [plaintiff] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment[.]").

And Plaintiff concedes his NEID claim. "Michigan recognizes the tort of negligent infliction of emotional distress only when a plaintiff witnesses negligent injury to a *third party* and suffers mental disturbance as a result." *Teadt v. Lutheran Church Missouri Synod*, 582, 603 N.W.2d 816, 823 n.6 (Mich. Ct. App. 1999) (emphasis added); *accord Wells v. Home Depot U.S.A., Inc.*, No. 08-12135, 2009 WL 3068797, at *13 (E.D. Mich. Sept. 22, 2009). Recognizing this precedent, Plaintiff responded to summary judgment that his NEID claim "should be dismissed." ECF No. 38 at PageID.1614. At bottom, all Defendants are entitled to summary judgment on Plaintiff's negligent tort claims—Counts III and V.

**V.**

In sum, all Defendants are entitled to summary judgment on all Counts. Plaintiff's Fourth Amendment rights were not deprived by any Defendant. Plaintiff received substantive due process throughout his disciplinary proceedings. Although Plaintiff may have been deprived of procedural due process, only Defendants Zimba or Defendant CCPS could be liable for this deprivation. But the first is entitled to qualified immunity, and the latter is not liable under *Monell*. Additionally, all Defendants are immune from Plaintiff's three tort claims, which otherwise lack merit.

Accordingly, it is **ORDERED** that Defendants' Renewed Motion for Summary Judgment, ECF No. 36, is **GRANTED.**

Further, it is **ORDERED** that Plaintiff's Amended Complaint, ECF No. 33, is **DISMISSED WITH PREJUDICE.**

Further, it is ORDERED that Plaintiff's pending Motions *in Limine*, ECF No. 42; 43, are **DENIED AS MOOT.**

**This is a final order and closes the above-captioned case.**

Dated: May 23, 2025                                            s/Thomas L. Ludington
                                                              THOMAS L. LUDINGTON
                                                              United States District Judge